J-A24009-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS OF: D.M.T.-S. AND C.A.W. AS TO THE MINOR CHILD A.K.W. | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.T.-S. | : : : : | |
| | : | No. 246 WDA 2020 |

Appeal from the Decree Entered January 22, 2020
In the Court of Common Pleas of Elk County Orphans' Court at No(s):
CP-24-OC-13-2018

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    FILED OCTOBER 07, 2020

D.M.T.-S. ("Mother") appeals from the decree dated January 16, 2020, and entered on January 22, 2020, that granted the petition filed by the Elk County Children and Youth Services ("CYS") to involuntarily terminate Mother's parental rights to her minor child, A.K.W. (born in August of 2014) ("Child"), pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]   We affirm.

"The circumstances by which [Child] was placed in the custody of [CYS] are compelling.   [CYS] was granted emergency custody of [Child] on October 24, 2016, after [M]other and her then-paramour, [M.M.], were criminally charged with physically abusing, assaulting, and otherwise traumatizing

_____

[1] The parental rights of Child's father, C.A.W. ("Father"), were terminated by a separate decree on the same date; however, Father is not a party to this appeal.

[Child]." Orphans' Court Opinion ("OCO I"), 10/18/18, at 2 ¶ 4. "After [Child] was placed in foster care by virtue of the October 24, 2016 emergency custody order, a shelter care hearing was conducted on October 26, 2016, and custody of [Child] continued to be placed with [CYS]." Id. at 2 ¶ 5. An adjudication hearing on the dependency petition filed in this matter was held on November 3, 2016, and Child was adjudicated dependent. Id. at 2 ¶ 6. A disposition hearing was then conducted on November 23, 2016, and CYS was awarded custody of Child. Id.

The following additional findings of facts, in relevant part, were made by the orphans' court:

8. [] Child has been in placement with [CYS] for at least fifteen of the last twenty-two months and for at least fifteen consecutive months since initial placement on October 24, 2016.

9. The initial intake was occasioned by … [C]hild's presentation to Ridgway QCare[,] where [she] was observed to have substantial bruising from head to toe, particularly excluding the vagina[l] area. Photos were taken by the intake caseworker, Stacie Clerkin, and admitted into evidence in this proceeding. [] Child was two years of age at the time.

10. As a result of these observations[,] Mother was prosecuted[,] and a jury verdict of guilty [was entered] to [the charge of] Child Endangerment[,] with engagement in a course of conduct noted.

11. [] Child was placed with and has resided continuously with [S.C. ("Foster Father") and Y.C. ("Foster Mother") (collectively "Foster Parents") in] St. Mary's, Pennsylvania.

12. The initial dispositional order set forth the following goals for Mother:

a) complete a mental health assessment and follow through with all recommendations;

b) complete a drug and alcohol assessment and follow through with all recommendations;

c) complete a bonding assessment between minor [C]hild and her [M]other;

d) complete parenting education classes including Parents As Teachers and follow through with all recommendations as evidenced by her demonstration of skills taught to her;

e) participate in parent-child interactive therapy and follow through with all recommendations; and[]

f) all costs incurred for assessments, evaluations and classes shall be the sole responsibility of Mother.

13. As a result of the first permanency review hearing conducted on April 19, 2017, Mother's rating for both compliance and progress were deemed to be minimal. Mother had not completed her drug and alcohol assessment; [she had] failed to complete the Incredible Years [program] and was discharged due to lack of attendance; [she] missed several days of her scheduled counseling; and [she] had not obtained housing. Mother did, however, participate in the psychiatric evaluation with Dr. Leavitt on March 7, 2017, attended all but one scheduled visit, consistently participated in Parents As Teachers, and participated in a bonding assessment on January 19, 2017[,] with Dr. Ryen.

...

15. The second permanency review order was entered [on] October 18, 2017. Mother's compliance was rated as minimal for the following reasons, to wit: [S]he had not received mental health management services throughout this review. She had recently completed her court[-]ordered drug and alcohol assessment, and she continued to struggle with demonstrating appropriate parenting skills during visitation. Mother's "progress" was also rated as minimal for the following reasons, to wit: [S]he had not made any progress with her mental health treatment[,] as she had not participated in mental health management services throughout this review period[. S]he was unable

to demonstrate improved parenting skills during visitation with [Child;] her bond with [Child] remained strained[;] she continued to struggle with her understanding of where [Child] was developmentally[;] and she did not take responsibility for the abuse toward [Child] aside from stating that she let it happen....

16. The third permanency review order was entered [on] April 16, 2018. Mother's compliance was rated as moderate for the following reasons, to wit[: M]other did not attend mental health counseling for eight months. In December [of] 2017[, she] returned to mental health counselling services and was meeting more consistently with her counselor. Mother had consistently attended visitation and met regularly with Parents As Teachers. Mother's progress was rated as minimal for the following reasons, to wit[: S]he continued to struggle with appropriate parenting, struggled with understanding [Child's] emotional and developmental needs, and was [not] developing a secure bond with [Child]. Issues continued during visitation. There was progress in her mental health. She did not maintain stable housing....

17. The fourth permanency review order was entered [on] August 7, 2018. Mother's compliance was rated as moderate for the following reasons, to wit: [S]he participated in a bonding assessment with Dr. Ryen. She continued to meet regularly with her mental health counselor. She met regularly with Parents As Teachers[] but, to [CYS's] knowledge, had not followed through with attending (retaking) the Incredible Years [program]. She consistently attended visits with [Child]. Her progress was rated as minimal for the following reasons, to wit: [S]he continue[d] to struggle with appropriate parenting and understanding [Child's] emotional and developmental needs. There was not a healthy and secure bond. There was progress in her mental health treatment and personal progress. She had maintained stable housing....

18. The [c]ourt, after hearing, by opinion and order dated October 18, 2018, entered an order changing the primary and concurrent placement goals to adoption. The [c]ourt further ordered that hearing on the petition to terminate parental rights of [Mother and Father] to [Child] should be scheduled, and [CYS] was permitted to terminate the

provision of services to promote reunification and cease parental visitation. Although present at the goal change hearing[,] Mother did not testify even though her criminal conviction for endangering the welfare of [Child] had occurred prior to the goal change hearing, i.e.[, c]riminal conviction by a jury occurred on January 26, 2018[,] and the goal change hearing occurred on June 13, 2018.

...

20. The Pennsylvania Superior Court, by memorandum filed May 23, 2019, at No. 1657 WDA 2018, affirmed the trial court's order changing the permanency goal to the goal of adoption.

21. At [the] hearing[] on termination of [Mother's] parental rights[,] Dr. Ryen's bonding assessments ... were introduced into evidence. In his January 22, 2017 assessment[,] Dr. Ryen concluded that[,] although it can certainly be argued that there has been opportunity for a primary maternal bond, this bond appears weak and insecure, if not pathological. Of more concern is Dr. Ryen['s] relating the following, inter alia, to wit: "...Mother continued that [M.M.] had become highly abusive to [Child] as well, 'started beating her real bad ... was awful to her...[.] Hit her on the head with the potty chair[,] ... would make her sit on the toilet for hours .... [O]nce she fell asleep and fell in[,] and he made her take a cold shower[,] ... put a wet diaper on her face and in her mouth .... [W]hen Mother] tried to stand up for her, he would beat on her even more[.'" M.M.] would take [Child] into a back room and pummel her with a small hard gym ball, leaving bruises. Mother said that somehow she had gotten "attached to [M.M.] and didn't feel she could leave." Mother said that she had been afraid to "give [M.M.] up" to the police, adding that she thought he might be hurt really bad. She also explained that she had helped perpetuate [M.M.'s] story to police, showing police that it was her handprint on [Child's] back[].

22. Dr. Ryen's bonding assessment dated June 7, 2018[,] concluded, inter alia, to wit: Dr. Ryen noted no significant gains or changes in the nature and quality of bonding between [M]other and [Child]; that much of [Child's] resistance to ... [M]other may be the fact that she had begun to bond securely with ... [F]oster [P]arents, and she was

fearful of losing this important source of nurturance and security.

23. At the continued [termination] hearing held [on] August 14, 2019, Dr. Ryen, [who] previously qualified as an expert witness in the field of psychology, testified that [Child] was primarily and securely bonding with ... [F]oster [P]arents, and it would be detrimental to her developmental physical and emotional needs[] to sever the bond she has with ... [them]. He further testified that he does not believe it would be psychologically damaging to [Child] if ... [M]other's parental rights were terminated[,] because there was no secure bond in place to be disrupted.

24. Photographs of the severe physical abuse suffered by [Child] were introduced into evidence at the termination hearing....

25. The verdict of guilty by the jury[,] entered after [a] criminal trial [was] held [on] January 26, 2018, ... against [M]other for the crime of "Endangering the Welfare of Children (parent/guardian)" [(]18 Pa.C.S.[] § 4304(a)(1)[)], graded as a felony of the [third degree,] ... was introduced at the termination hearing. [Child] was the victim in this criminal case.

...

27. [] Child has been in continuous placement, with CYS having both legal and physical custody of ... [C]hild, from the entry of the emergency order on October 24, 2016[,] to the present.

28. [] Child has been in continuous placement with [Foster Parents for 33] continuous months[,] as of the date of the [termination] hearing held [on] August 14, 2019.

29. [Foster Mother] testified that [Child's] demeanor changes after she has visits with ... [M]other. Further, [Foster Mother] testified that [Child] is more aggressive[. She] does not want to go to the potty[. She] is afraid of the potty[. S]he is mean to the other children[. S]he is very emotional, and she has nightmares in the middle of the night[.] [Child's] hair was falling out, and she exhibited rashes all over her body, which rashes stopped after visits with ... [M]other stopped. She further testified that [Child]

is thriving in her home. In addition,... [F]oster [P]arents are an adoption resource for [Child].

30.    [Child's] fear of bathrooms was attributed, by ... [M]other's testimony, to the abuse suffered by [Child] in the bathroom.

31.    Mother testified at the [termination] hearing, and also had testimony on her behalf given by her current husband[2] and her mother.

32.    [] Child currently resides with ... [F]oster [P]arents ... at their residence in St. Mary's.

Findings & Conclusions, 1/22/20, at 2-9 (unpaginated; internal brackets, citations to record, and unnecessary capitalization omitted).

In light of the foregoing findings, the orphans' court entered a decree on January 22, 2020, which involuntarily terminated the parental rights of Mother to Child, pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). Mother filed a timely notice of appeal on February 19, 2020, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). She now presents the following sole issue for our review: "Whether the [orphans'] court abused its discretion in finding that [the] Elk County [CYS] produced clear and convincing evidence to support an involuntary termination, under 23 Pa.C.S.[] Section 2511(a)(1), [](2), [](5)[,] and [](8), of [Mother's] parental rights[?]" Mother's Brief at 8.

_____

[2] Mother married J.A.H. ("Husband") on July 27, 2018. She has two other children with Husband, and she testified at the termination hearing that they were in the process of purchasing a home. See N.T. Hearing, 8/14/19, at 90-91.

We review a decree terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009) (quoting In re S.H., 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

Id. (quoting In re J.L.C. & J.R.C., 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. In re M.G., 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. R.N.J., 985 A.2d at 276.

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

- 9 -

> causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> * * *

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

In re K.Z.S., 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

Id. Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." In re A.S., 11 A.3d 473, 481 (Pa. Super. 2010).

Instantly, Mother argues that she "completely complied with the permanency and dispositional order in terms of engaging in any sort of treatment and parenting classes guided towards alleviating the conditions which necessitated placement of ... [C]hild." Mother's Brief at 20. She further alleges that "there was substantial, credible testimony from both [CYS] and [Mother] that [she] was a beyond fit and able parent, who was able to provide for the emotional needs and well-being of ... [C]hild...." Id. Mother concludes that she "remedied all issues[,] to the extent that they existed, was willing to do so[,] and continually engaged in services to assist her with those issues." Id. at 26. The record belies Mother's claims.

As summarized by the orphans' court:

The evidence established [at] the October 17, 2017 permanency review hearing, the hearing closest to the filing of the [termination] petition, revealed that [M]other had only effected minimal compliance with the permanency plan. While she may have engaged in parenting services as argued by [Mother], it was noted that she continued to struggle with demonstrating appropriate parenting skills during visitation. In other words, it is not the number of parenting services engaged, it is the progress demonstrated in utilizing that training during visitation.

In the April 19, 2017 permanency review hearing order, which was the product of stipulations by counsel, it was noted that [M]other had not obtained and maintained suitable housing, and she was ordered to do so at that time. While there is no mention of progress in obtaining housing in the October[] 2017 permanency review hearing findings, it [was] ordered that she continue to maintain clean and stable housing. The testimony from the goal change hearing on June 13, 2018 discusses that during the review period she had located [to] a residential dwelling, but had been evicted from that dwelling and moved into a trailer with a new paramour, who [M]other began dating in June [of] 2017. Even with this level of established housing maintenance, the court considered the housing as only one factor among many in granting the motion for goal change.

Orphans' Court Opinion ("OCO II"), 5/14/20, at 4 (unpaginated; unnecessary capitalization omitted; emphasis added).

Additionally, the orphans' court found:

CYS undertook reasonable and sustained efforts to finalize the permanency plan to no avail. It has been the failure of Mother to progress with her parenting skills and mental health treatment, together with her unwillingness to effectuate necessary changes that have resulted, in turn, to the inability to finalize the permanency plan.... Mother has not made any continual or constant progress.... This has led to a failure ... to alleviate the circumstances which led to [Child's] initial placement in October [of] 2016.

Findings & Conclusions at 10 ¶¶ 36-37. Moreover, the orphans' court held:

- 12 -

> The evidence clearly and convincingly demonstrated that the repeated and continued incapacity of [M]other and [F]ather has caused [Child] ... to be without essential parental care, control, and subsistence necessary for her physical and mental well-being in [sic] the causes of that incapacity cannot or will not be remedied by [M]other and [F]ather.

Id. at 12 ¶ 47.

> Accordingly, the orphans' court concluded:

> Sufficient evidence was presented to support involuntary termination of ... [M]other's parental rights. Although [M]other complied with some aspects of her family service plan, evidence established that the conditions that led to ... [C]hild's removal, including lack of parenting skills and sporadic compliance with her mental health issues, had not been corrected when the termination petition was filed, and ... [C]hild, who [was] approximately two years [and] two months old at the time of placement with ... [F]oster [Parents,] ... is now currently five years of age, and she has strong bonds with ... [F]oster [P]arents.

Id. at 14 ¶ 55. We deem the orphans' court's determinations to be well-supported by the record.

Having resolved that grounds for termination existed under Section 2511(a)(2), we now proceed to the second part of the analysis under subsection (b). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to

> discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). With respect to the bond analysis pursuant to Section 2511(b), the Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." Id. "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." Id. at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, ... the result, all too often, is catastrophically maladjusted children." Id.

Here, Mother did not raise a challenge to the court's findings under Section 2511(b) in her Pa.R.A.P. 1925(b) statement of errors complained of on appeal, nor does she address Section 2511(b) in her brief. Accordingly, we find that she has waived any challenge to the court's Section 2511(b) finding that it was in Child's best interests for Mother's parental rights to be terminated. See Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); Commonwealth v. Spotz, 18 A.3d 244, 281 n.21 (Pa. 2011) (without a "developed, reasoned, supported, or even intelligible argument[, t]he matter is waived for lack of development"); In re M.Z.T.M.W., 163 A.3d 462, 465–66 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it

is developed in the argument section of an appellant's brief, and supported by citations to relevant authority[.]") (citing In re W.H., 25 A.3d 330, 339 n.3 (Pa. Super. 2011)).

Even if not waived, however, we would deem any challenge to the termination under Section 2511(b) to be meritless, as the record overwhelmingly supports the orphans' court's decision to terminate Mother's parental rights pursuant to this section. In its opinion, the orphans' court emphasized the "overwhelming evidence of how well … [C]hild was doing in placement under the care and comfort of her [Foster Parents]." OCO II at 6. The court also pointed to repeated claims that, over time, Child was becoming more alienated from Mother. Id. "Psychological testimony opined that the [M]other-[C]hild bond was minimal to nonexistent[,] and that the bond created between … [C]hild and [Foster Parents] was strong." Id. at 6-7.[3]

_____

[3] Dr. Ryen testified that, over the course of a year and a half between the two bonding assessments that he conducted, the bond between Mother and Child "was different but not better." N.T. Hearing at 135. "I didn't see any improvement in the quality of their relationship. I thought that [Child] was more contrary with … [M]other, more resistant, less tolerant of interactions, less tolerant of physical contact, downright intolerant of action.… [S]he almost appeared to go out of her way to shun … [M]other." Id. at 136. Moreover, Dr. Ryen opined that it would not be psychologically damaging to Child to terminate Mother's parental rights, because there is not a secure bond in place to be disrupted. Id. at 138-39. In contrast, when asked about whether ending the relationship between Child and her Foster Parents would be damaging, he stated: "We've got a child who is … securely attaching to [Foster Parents] who have proven to her their trustworthiness and to whom she's allowed herself to be vulnerable.… [S]he's afraid of losing this secure relationship she's got with … [them]." Id. at 139. Dr. Ryen added, "to the extent that some of these dynamics are traumatic…, ongoing contacts with …

"The time had come for ... [C]hild to get on with her life and hopefully erase the emotional scars that traumatized her at the outset of the placement." Id. at 7.

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Mother, we discern no error or abuse of discretion in its determinations under Section 2511(b). See In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012). Accordingly, we affirm the decree terminating Mother's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2020

_____

[M]other may re[-]traumatize [Child.] ... [They may] bring up memories and cues and nuances that she associates with having been abused...." Id. at 139-40. "[T]he bottom line here ... is [that] ... I'm concerned about disrupting [Child's] secure bond with [F]oster [P]arents,... because I know it's got potential lifetime repercussions." Id. at 148-49.